**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

Kalond Stoker,

              Plaintiff,

v.

TT OF WOODMEN, INC., a Colorado corporation
d/b/a WOODMEN NISSAN,

              Defendant.

---

## COMPLAINT

---

COMES NOW Plaintiff, Kalond Stoker, by and through his counsel, Cornish & Dell'Olio, P.C., and for his Complaint against the Defendant, TT of Woodmen, Inc., d/b/a Woodmen Nissan, alleges as follows:

### Introduction

1.      This is an action brought against the Defendant, TT of Woodmen, Inc., d/b/a Woodmen Nissan, pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981.

### Jurisdiction

2.      Jurisdiction is proper in the U.S. District Court for the District of Colorado pursuant to 28 U.S.C. §§ 1331 and 1343.

### Venue

3.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2) as the actions giving rise to this action occurred in the State of Colorado.

## Parties

4.      Mr. Stoker is a resident of Harleton, Texas who was employed by TT of Woodmen, Inc. d/b/a Woodmen Nissan.

5.      At all times relevant to this Complaint, Mr. Stoker was a resident of Colorado.

6.      TT of Woodmen, Inc., d/b/a Woodmen Nissan (hereafter "Woodmen Nissan") is a Colorado corporation that operates a new and used car dealership in Colorado Springs, CO.

## Factual Allegations

7.      Paragraphs 1 through 8 are incorporated herein.

8.      Kalond Stoker is an African American man.

9.      Mr. Stoker is Black.

10.     Although Mr. Stoker's first name is Kalond, he goes by the nickname "Big K."

11.     Mr. Stoker has used the nickname "Big K" since childhood and continues to use that nickname as an adult in both personal and professional settings.

12.     Mr. Stoker has significant experience working in the new and used car sales business.

13.     TT of Woodmen, Inc, d/b/a Woodmen Nissan (hereafter "Woodmen Nissan") is a new and used car dealership in Colorado Springs, Colorado.

14.     Woodmen Nissan hired Mr. Stoker on November 1, 2019 to work as a salesman.

15.     When Mr. Stoker was hired, Woodmen Nissan issued him a nametag that read "Big K."

16.     Woodmen Nissan also identified Mr. Stoker on its website as "Big K."

17.     Woodmen Nissan had a board hanging on the wall in the sales office that listed the salespeople by name and indicated the number of sales each salesperson had made in a given period.

18.     Mr. Stoker was identified on the sales board in Woodmen Nissan's sales office as "Big K."

19.     During his employment with Woodmen Nissan, Mr. Stoker satisfactorily performed the duties of his position.

20.     Mr. Stoker was a good salesman.

21.     Mr. Stoker outperformed many of his coworkers.

22.     Mr. Stoker was consistently rated by customers as one of the top salespeople at Woodmen Nissan.

23.     Woodmen Nissan never expressed any concerns about Mr. Stoker's job performance.

24.     Brock Wilson, the General Sales Manager, was Mr. Stoker's supervisor.

25.     Brock Wilson is a white man.

26.     Brock Wilson reported directly to Mike Jackson, the managing partner of Woodmen Nissan.

27.     Mike Jackson is a white man.

28.     During Mr. Stoker's employment, all of his coworkers and coworkers referred to him as "Big K" except for his supervisor, Brock Wilson.

29.     Mr. Wilson would not refer to Mr. Stoker by his chosen nickname, nor would he refer to Mr. Stoker by his given name "Kalond."

30.     Instead of calling him "Big K" or "Kalond," Mr. Wilson would make fun of Mr. Stoker and mock him by referring to Mr. Stoker with insulting or demeaning nicknames.

31.     Mr. Wilson repeatedly called Mr. Stoker "Tiny."

32.     Mr. Wilson repeatedly called Mr. Stoker "Pequeno," which in Spanish means "little."

33.     Mr. Wilson called Mr. Stoker "Tiny" and "Pequeno" in sales meetings and in front of customers.

34.     Mr. Wilson did not call Mr. Stoker "Tiny" or "Pequeno" in a jovial or light-hearted manner, but rather used a tone of voice that indicated he was intentionally insulting Mr. Stoker when he called Mr. Stoker by those names.

35.     One of Mr. Stoker's coworkers informed him that she heard Mr. Wilson referring to Mr. Stoker as "Tiny K."

36.     The same coworker who heard Mr. Wilson refer to Mr. Stoker as "Tiny K" also observed Mr. Wilson erase Mr. Stoker's "Big K" nickname from the sales board and replace it with "Little K" and "Tiny."

37.     Upon information and belief, Mr. Wilson specifically used the nicknames "Tiny" and "Pequeno" in reference to Mr. Stoker in order to marginalize Mr. Stoker, to show Mr. Stoker that he was inferior to Mr. Wilson, and to specifically embarrass and humiliate Mr. Stoker in front of his coworkers and customer.

38.     Mr. Wilson also called Mr. Stoker "Kanye," a reference to the rapper Kanye West.

39.     Upon information and belief, Mr. Wilson called Mr. Stoker "Kanye" because Mr. Stoker is Black and Kanye West is Black and both have first names that start with the letter "k."

40.     Mr. Stoker never heard Mr. Wilson refer to any white employees by any names other than their chosen names or nicknames.

41.     Mr. Stoker heard Mr. Wilson use racial slurs in the workplace, including calling a Hispanic employee as "spic."

42.     One of Mr. Stoker's coworkers told him that she overheard another employee talking with Mr. Wilson about Mr. Stoker.  The employee stated: "Big K ain't shit," to which Mr. Wilson responded "he's just a nigger."

43.     After being called "Tiny" or "Pequeno" by Mr. Wilson on multiple occasions, Mr. Stoker told Mr. Wilson that he felt that Mr. Wilson was being disrespectful and asked Mr. Wilson to stop.

44.     In response to Mr. Stoker's complaint, Mr. Wilson told him to get a thick skin and not to "be a P-U-S-S-Y."

45.     When Mr. Wilson made it clear that he was not taking Mr. Stoker's complaint seriously, Mr. Stoker went to Mike Jackson to complain about how he was being treated by Mr. Wilson.

46.     Mr. Stoker reported to Mr. Jackson that he felt insulted and offended by Mr. Wilson.

47.     Mr. Stoker told Mr. Jackson about Mr. Wilson referring to him with insulting nicknames and indicated to Mr. Jackson that he felt Mr. Wilson was being disrespectful to him because of his race and color.

48.     Mr. Stoker told Mr. Jackson that "you all wanted a top salesman here you just didn't want a black salesman."

49.     Mr. Jackson responded by saying that he "doesn't have a racist bone" in his body and offered to talk to Mr. Wilson about Mr. Stoker's concerns.

50.     Mr. Jackson's comment about not having a racist bone in his body indicated his awareness that Mr. Stoker was complaining to him about conduct by Mr. Wilson that Mr. Stoker perceived to be race discrimination.

51.     Mr. Jackson's statement that he "doesn't have a racist bone" in his body is false.

52.     Mr. Jackson and Woodmen Nissan were sued for race discrimination in 2017 based on allegations that Mr. Jackson directed racial slurs at a Black employee and used racially demeaning nicknames in conversations with and about that Black employee.

53.     After Mr. Stoker complained to Mr. Jackson about how Mr. Wilson was treating him, Mr. Wilson confronted the sales staff, including Mr. Stoker, and yelled at everyone while staring directly at Mr. Stoker.

54.     During that confrontation, Mr. Wilson angrily stated that he "makes over $300,000/year and if you have a problem with how I run my department, take it up with me."

55.     It was clear to Mr. Stoker that Mr. Wilson was directing that outburst at him in response to learning that Mr. Stoker had complained to Mr. Jackson about Mr. Wilson.

56.     After Mr. Wilson's angry outburst, he did not stop calling Mr. Stoker "Tiny" or other names.

57.     Not long after Mr. Stoker told Mr. Wilson to stop calling him "Tiny" and complained to Mr. Jackson about Mr. Wilson's behavior, someone erased Mr. Stoker's name, "Big K," from the sales board and replaced it with the name "Tiny."

58.     Based on Mr. Stoker's repeated interactions with Mr. Wilson in which Mr. Wilson called him "Tiny," and based on the report to Mr. Stoker from a coworker about having seen Mr. Wilson erase "Big K" from the sales board in the past and replace it with "Little K" and "Tiny," Mr. Stoker asserts on information and belief that Mr. Wilson was the individual who erased his name and replaced it with "Tiny."

59.     A customer that was buying a car from Mr. Stoker saw that his name had been replaced with "Tiny," erased "Tiny" from the board, and wrote "Big K" back on the board.

60.     After the customer erased "Tiny" from the sales board, Mr. Stoker and the customer went the finance department as part of the sales process.

61.     When Mr. Stoker and the customer returned from the finance department, Mr. Stoker saw that someone had written "Nigger K" on the sales board.

62.     As Mr. Stoker was the only employee of Woodmen Nissan who went by a nickname that included the use of the letter "k," he asserts upon information and belief that the "N****r K" that was written on sales board was written in reference to him.

63.     Mr. Stoker was horribly offended by seeing "N***er K" written on the sales board.

64.     Mr. Stoker was humiliated by seeing "N****r K" written on the sales board in a location that could be viewed by any employee or customer of Woodmen Nissan.

65.     Mr. Stoker was embarrassed that this incident occurred in front of a customer he was working with and in the presence of his coworkers.

66.     Mr. Stoker believes that referring to an African American or Black person as a "n****r" is the worst possible thing anyone can say to an African American or Black person.

67.     Mr. Stoker believes that a person who refers to an African American or Black person as a "n****r" has shown racial antipathy and bigotry toward African American or Black people.

68.     Mr. Stoker was deeply hurt and offended by learning that he had been referred to as a "n****r" in writing in a public location at his place of employment.

69.      Mr. Stoker's anguish at being referred to by that hurtful epithet was compounded by the fact that the epithet was seen by employees and customers of Woodmen Nissan who understood that the words "N****r K" were specifically directed at him.

70.      Mr. Stoker was referred to as a "n****r" because of his race.

71.      As Mr. Wilson had previously written derogatory nicknames about Mr. Stoker on the sales board and as Mr. Wilson had previously referred to Mr. Stoker as a "n****r" in a conversation with another employee, Mr. Stoker asserts on information and belief that Mr. Wilson wrote "N****r K" on the sales board.

72.      After "N****r K" was written on the sales board, Mr. Stoker spoke with Chris Gallion, Woodmen Nissan's Used Car Sales Manager about the slur that had been written on the board.

73.      As Mr. Stoker's prior complaints to Mr. Wilson and Mr. Jackson had been ineffective, Mr. Stoker hoped that Mr. Gallion could provide some help.

74.      Mr. Gallion told Mr. Stoker that he could help him with his concerns.

75.      As Mr. Stoker's complaint to Mr. Jackson escalated the race-based hostility he was subjected to, and as his complaint to Mr. Gallion fell on deaf ears, Mr. Stoker found himself in a work environment where it was clear to him that management would tolerate, condone, and permit the most egregious forms of race discrimination.

76.      Mr. Jackson's ineffective response to Mr. Stoker's complaint, and Mr. Gallion's refusal to help Mr. Stoker with his complaint, showed Mr. Stoker that if he were to continue working at Woodmen Nissan, he would be doing so in an environment

where there was a continual risk that he would be referred to as a nigger in front of his customers and coworkers.

77.     That Woodmen Nissan created and tolerated an environment where racial slurs could be written in public places with impunity and failed to take any action in response to complaints of discrimination made the performance of Mr. Stoker's duties significantly more difficult than they had been before he was identified as "N****r K" on the sales board.

78.     Those added difficulties rendered Mr. Stoker unable to effectively perform the duties of his job.

79.     Accordingly, Mr. Stoker felt that he had no choice but to resign his position with Woodmen Nissan, and on December 31, 2019 resigned.

80.     Woodmen Nissan constructively terminated Mr. Stoker's employment because of his race and color.

81.     Mr. Stoker suffered significant emotional distress and economic loss as a result of how he was treated by Defendant.

**First Claim for Relief (42 U.S.C. § 1981—Hostile Work Environment)**

82.     Plaintiff realleges all prior paragraphs and incorporates them herein.

83.     Title 42 U.S.C. § 1981 provides in pertinent part:

> (a)     All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, to be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .
> (b)     For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits,
privileges, terms and conditions of the contractual relationship

84.     Mr. Stoker is a Black African American man and is thus a member of a

protected class under 42 U.S.C. § 1981.

85.     Defendant discriminated against Plaintiff because of his race in violation of

42 U.S.C. § 1981 by engaging in, tolerating, or failing to prevent the race-based

harassment alleged herein and by failing to take affirmative action to correct and

redress these unlawful employment practices.

86.     Defendant has denied Plaintiff the protections against race discrimination

provided by 42 U.S.C. § 1981 in the terms and conditions of his employment.

87.     Defendant discriminated against Plaintiff in the making or enforcement of

its contract with him, wholly or in part, because of his race.

88.     During Plaintiff's employment he was subjected to offensive and

unwelcome comments based on his race.

89.     Plaintiff clearly indicated that the conduct was unwelcome. Plaintiff did not

solicit or incite the conduct and he perceived the conduct to be offensive and/or

undesirable.

90.     This conduct and other incidents of harassment described above were

because of Plaintiff's race.

91.     The conduct suffered by Plaintiff was sufficiently pervasive or severe to

alter and did alter a condition of Plaintiff's employment and created an abusive working

environment.

92.    Plaintiff was detrimentally affected by the conduct and such conduct would have detrimentally affected a reasonable person in Plaintiff's position.

93.    Defendant Woodmen Nissan knew or should have known of the harassment described herein and Mr. Wilson's propensity to engage in such race-based harassment and failed to implement prompt and appropriate corrective action.

94.    Defendant Woodmen Nissan is vicariously liable to Plaintiff for the acts of harassment committed against him by Mr. Wilson.

95.    The harassment directed at Plaintiff was either intended to cause him emotional distress or was perpetrated with malice or reckless indifference to the likelihood that it would cause such distress. Defendant is, therefore, liable to Plaintiff for all damages proximately resulting from the distress he has suffered relating to Defendant's conduct.

96.    Defendant's conduct was willful, wanton, and in reckless disregard of Plaintiff's federally protected rights, and was the proximate cause of significant injuries, damages, and losses incurred by Plaintiff.

**Second Claim for Relief (Title VII—Hostile Work Environment)**

97.    Plaintiff realleges all prior paragraphs and incorporates them herein.

98.    Mr. Stoker is a Black African American man and is thus a member of protected classes under 42 U.S.C. § 2000e, *et seq.*

99.    Defendant discriminated against Plaintiff because of his race and/or color in violation of Title VII by engaging in, tolerating, or failing to prevent the race and color-

based harassment alleged herein and by failing to take affirmative action to correct and redress these unlawful employment practices.

100.    Defendant has denied Plaintiff the protections against race and/or color discrimination provided by Title VII in the terms and conditions of his employment.

101.    During Plaintiff's employment he was subjected to offensive and unwelcome comments based on his race and/or color.

102.    Plaintiff clearly indicated that the conduct was unwelcome. Plaintiff did not solicit or incite the conduct and he perceived the conduct to be offensive and/or undesirable.

103.    This conduct and other incidents of harassment described above were because of Plaintiff's race and/or color.

104.    The conduct suffered by Plaintiff was sufficiently pervasive or severe to alter and did alter a condition of Plaintiff's employment and created an abusive working environment.

105.    Plaintiff was detrimentally affected by the conduct and such conduct would have detrimentally affected a reasonable person in Plaintiff's position.

106.    Defendant Woodmen Nissan knew or should have known of the harassment described herein and Mr. Wilson's propensity to engage in such race and/or color-based harassment and failed to implement prompt and appropriate corrective action.

107.    Defendant Woodmen Nissan is vicariously liable to Plaintiff for the acts of harassment committed against him by Mr. Wilson.

108.    The harassment directed at Plaintiff was either intended to cause him emotional distress or was perpetrated with malice or reckless indifference to the likelihood that it would cause such distress. Defendant is, therefore, liable to Plaintiff for all damages proximately resulting from the distress he has suffered relating to Defendant's conduct.

109.    Defendant's conduct was willful, wanton, and in reckless disregard of Plaintiff's federally protected rights, and was the proximate cause of significant injuries, damages, and losses incurred by Plaintiff.

### Third Claim for Relief (42 U.S.C. § 1981—Constructive Discharge)

110.    Plaintiff realleges all prior paragraphs and incorporates them herein.

111.    Plaintiff was at all times qualified to perform his job duties and performed them satisfactorily.

112.    Defendant has denied Plaintiff the protections against race discrimination provided by Section 1981 in the terms and conditions of his employment and in constructively discharging him wholly or in part based upon his race.

113.    Defendant, at least by and through the conduct of their employees, discriminated against Plaintiff in the making or enforcement of their contracts with him, wholly or in part, because of his race.

114.    As set forth above, Defendant unlawfully created working conditions for Mr. Stoker that were so intolerable that a reasonable person in Mr. Stoker's position would feel forced to resign.

115.    Defendant created the intolerable working conditions because of Mr. Stoker's race.

116.    Plaintiff resigned his position because of the intolerable working conditions created by Defendants.

117.    Defendants' actions caused Plaintiff to suffer significant emotional distress and economic losses.

118.    Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's federally protected rights, and was the proximate cause of significant injuries, damages, and losses incurred by Plaintiff.

### Fourth Claim for Relief (Title VII—Constructive Discharge)

119.    Plaintiff realleges all prior paragraphs and incorporates them herein.

120.    Mr. Stoker is a Black African American man and is thus a member of protected classes under 42 U.S.C. § 2000e, *et seq.*

121.    Plaintiff was at all times qualified to perform his job duties and performed them satisfactorily.

122.    Despite Plaintiff's qualifications, Defendant subjected him to discrimination because of his race and/or color.

123.    As set forth above, Defendant unlawfully created working conditions for Mr. Stoker that were so intolerable that a reasonable person in Mr. Stoker's position would feel forced to resign.

124.    Defendant created the intolerable working conditions because of Mr. Stoker's race and/or color.

125.    Plaintiff resigned his position because of the intolerable working conditions created by Defendants.

126.    Defendants' actions caused Plaintiff to suffer significant emotional distress and economic losses.

127.    Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's federally protected rights, and was the proximate cause of significant injuries, damages, and losses incurred by Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.  Economic damages, including back pay;

2.  Nonpecuniary and compensatory damages, including damages for emotional distress and consequential damages;

3.  Punitive damages;

4.  Nominal damages;

5.  Injunctive relief;

6.  A declaration that Defendants' conduct violated Plaintiff's rights under 42 U.S.C. § 1981;

7.  Pre- and post- judgment interest at the highest statutory rate;

8.  Costs and attorneys fees; and

9.  All other legal or equitable relief the court deems appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial for all issues triable by jury.

Respectfully submitted this 1st day of June, 2021.

CORNISH & DELL'OLIO, P.C.

s/Ian D. Kalmanowitz

Ian D. Kalmanowitz, # 32379
Cornish & Dell'Olio, P.C.
431 N. Cascade Avenue, Ste. 1
Colorado Springs, CO 80903
Telephone:  (719) 475-1204
Fax:  (719) 475-1264
Email:  ikalmanowitz@cornishanddellolio.com
Attorneys for Plaintiff

Plaintiff's Address:
1553 Dirskell Bridge Rd.
Harleton, TX 75651